UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIEDRA NORMAN, ) | |
| ) | |
| Plaintiff, ) | Case No. 23-cv-16514 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| 3C, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Diedra Norman got wind of some good news while working at 3C, LLC, a cannabis company. Her supervisor sent her texts saying that she was in line for a promotion. And better yet, the new job would come with better pay. The supervisor wrote that the promotion would come with a commission of 0.25% of total sales.

Before long, Norman got the promotion, but she didn't get all of the commissions. She received commissions on some sales, but not all of the sales made by the company.

So she sued. Norman brought six claims, but most of them weren't long for this world. Norman recently dropped five of the six claims. The only claim left standing is a claim for unpaid wages under the Illinois Wage Payment and Collection Act.

That claim faces strong headwinds. Norman's supervisor didn't have the authority to approve an increase in compensation, and Norman knew it. Norman knew that any raise would require the approval of the CEO. And here, the CEO didn't approve the pay increase. So she's out of luck.

The so-called contract was nothing more than a puff of smoke. For the reasons stated below, Defendant 3C, LLC's motion for summary judgment is hereby granted.

**Background**

From the get-go, a thick haze hovered over a basic part of the case. The parties mentioned that Norman worked at 3C, LLC. But they didn't reveal what, exactly, the company did. *See generally* Def.'s Statement of Facts (Dckt. No. 29); Pl.'s Statement of Facts (Dckt. No. 34). The company was shrouded in mystery, and the non-descript name sparked some curiosity.

This Court poked around, and hit pay dirt. As it turns out, 3C, LLC is a cannabis company. Maybe that's why the parties kept things on the down-low.

The company shows no such modesty about its business on its website. Quite the opposite. The company takes a loud-and-proud approach to its product line, and to the virtues of cannabis. The company's "mission is to harness the power of cannabinoids found in hemp to bring equilibrium within the human body and improve the lives of people worldwide." *See Who We Are*, https://3cllc.co (last visited July 5, 2025).

Cannabis, it seems, helps people "become the happiest and healthiest versions of themselves." *Id.* And the company offers the consuming public all sorts of ways to experience next-level serenity and happiness. The company "specialize[s] in creating a wide range of high-quality cannabis products, including vapes, edibles, tinctures, concentrates, terpenes, and bulk oils." *Id.*

The website is chock-full of colorful information about the company's brands. One brand is called 3CHI, which maybe means that 3C helps people get high. 3CHI includes gummies called "Comfortably Numb" and "Full Throttle," so users apparently have the option of going in opposite directions.

The company is currently selling a "Freedom Blend" in honor of the Fourth of July. *See 3CHI Shop*, https://www.3chi.com/shop (last visited July 5, 2025). It offers a cannabis seltzer called "Bombsicle."

Another option is a product line called "Reefer's Bay." *See 3C, Who We Are*, https://3cllc.co (last visited July 5, 2025). The brand features a picture of a pirate, with a scraggly-looking beard that is made of – you guessed it – cannabis leaves. To confirm his allegiance to all-things cannabis, a marijuana leaf sits proudly atop his pirate's hat. Hashbeard is ready to set sail on the high seas.

The pirate helps to hawk a line of cannabis-infused drinks, called "Chillixers." There's margarita, pina colada, mojito, and the like. There is a treasure trove of vapes, too, including "Maui Wowie" and "William Cyclops." The pirate also gives his blessing to a line of oils and droppers, including "Black Sails," "Cannonball," and "the Kraken."

Diedra Norman took a job with the company a few years ago, perhaps drawn by its adventurous spirit. The company hired her as a Sales Trainer in July 2021. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 1 (Dckt. No. 33).

Norman reported to Nicole Austin, the National Sales Director. *Id.* at ¶¶ 7, 12. Austin, in turn, reported to Justin Journay, the company's founder, owner, and CEO. *Id.* at ¶¶ 3, 7.

In December 2021, Norman received a series of texts from Austin about a potential promotion. Austin told Norman that "what's going to happen is we move you in to the management role beginning of [2022]." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 36); *see also* Pl.'s Ex. I., at 2 (Dckt. No. 32-9).

Norman responded to the texts with a bubble of excitement: "Woot woot." *See* Def.'s Resp. to Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 36).

Austin sent a few more texts about the promotion. Austin added that "[a]ll of you management folk will report to me," and "[t]he reps will report to you, [u]ntil we move people in to regional management." *Id.*

The promotion would come with a sweetener. Austin texted that Norman would "get 1/4 of a percent of total sales" as commissions. *Id.* Putting that number in perspective, Austin added that "1/4 percent this year would equal almost 70k." *Id.*

The phrase "total sales" included both inside sales and outside sales. Inside sales are made by employees who work in the corporate office in Indianapolis. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 33). Outside sales are made by employees who work elsewhere in the country. *Id.*

Norman's bubble of excitement eventually burst. Austin floated a plan, but it wasn't set it stone. After all, Journay, not Austin, was at the helm of the ship. As the CEO, Journay controlled any compensation decisions. Changes in compensation needed Journay's approval. *See* Pl.'s Ex. J, Norman Dep., at 61:5-24 (Dckt. No. 32-10).

Soon after the exchange of texts, Journay met with Austin at 3C's corporate office. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 23 (Dckt. No. 33). They discussed the proposed promotion of Norman.

Journay approved Norman's promotion to National Sales Manager. *Id.* at ¶ 24. But Journay didn't approve giving Norman 0.25% of total sales. *Id.* Journay did not approve the compensation described by Austin in her texts to Norman. *Id.* at ¶ 21.

Instead, he approved giving Norman 0.25% of *inside* sales only. *Id.* at ¶ 23. In other words, Journay approved giving Norman 0.25% of inside sales, but not outside sales.

4

After that meeting, Norman got the new role as the National Sales Manager. She got a new pay package, too. But she didn't get a cut of total sales.

By the sound of things, no one ever told Norman that she was getting a slice of inside sales only, not total sales. After receiving a few paychecks, Norman started asking questions. She later learned from coworkers that the company paid commissions based on inside sales, not total sales.

That discovery led to this lawsuit. The parties agree that Norman received a commission on inside sales, not total sales. *Id.* at ¶ 25. But as Norman sees things, the company owes her more. Norman believes that the company owes her commissions on total sales.

The complaint includes six counts. Norman brought claims under the Illinois Wage Payment and Collection Act ("IWPCA"), the (federal) Equal Pay Act, the Illinois Equal Pay Act, Title VII of the Civil Rights Act, and the Illinois Human Rights Act. *See* Cplt., at ¶¶ 17–37 (Dckt. No. 1).

After discovery, 3C moved for summary judgment. After reading the motion, Norman consented to the dismissal of Counts II through VI. *See* Pl.'s Mem., at 6 n.1 (Dckt. No. 31). So the Court grants summary judgment to 3C on Counts II, III, IV, V, and VI.

The only remaining claim is Count I, the claim for unpaid commissions under the Illinois Wage Payment and Collection Act.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

5

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

The only remaining claim falls under the Illinois Wage Payment and Collection Act. The claim goes nowhere fast. Norman has no claim because the company did not agree to pay her commissions based on total sales.

"The IWPCA provides employees with a cause of action against employers for the timely and complete payment of earned wages." *See Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). The statute basically requires employers to live up to their end of the deal.

"[T]he IWPCA provides no substantive relief beyond what the underlying employment contract requires. In other words, the IWPCA exists to hold the employer to his promise under the employment agreement." *Id.* at 570; *see also Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) ("[T]he IWPCA holds the employer only to its promise under the employment agreement.").

The Illinois Wage Payment and Collection Act is a means to enforce a preexisting right to payment based on an agreement with an employer. That is, the statute gives workers a cause of action to recover their unpaid compensation. But the statute does not create that right to compensation, in and of itself. It's an avenue, not an engine.

The IWPCA requires plaintiffs to "demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Enger*, 812 F.3d at 568. That is, the IWPCA "mandates overtime pay or any other specific kind of wage only to the extent the parties' contract or agreement requires such pay." *See Dominguez v. Micro Ctr. Sales Corp.*, 2012 WL 1719793, at *1 (N.D. Ill. 2012); *see also Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) ("To prevail on his IWPCA claim, Hess must first show that he had a valid contract or employment agreement.").

The definition of "wages" confirms the need for an understanding with the employer. The statute entitles employees to recover their "wages." *See* 820 ILCS 115/3. The definition of "wages," in turn, depends on the existence of a contract or agreement. The statute defines "wages" as "any compensation owed an employee by an employer pursuant to an employment *contract or agreement* between the 2 parties." *See* 820 ILCS 115/2 (emphasis added).

At first blush, the statute looks redundant. After all, a contract and an agreement often mean the same thing.

7

But not always. Illinois courts have given the statute a broad reading, based on the disjunctive phrase "contract *or* agreement" in the statutory text. *Id.* (emphasis added). The IWPCA is "'broader than a contract.'" *Hess*, 668 F.3d at 452 (quoting *Zabinsky v. Gelber Group, Inc.*, 807 N.E.2d 666, 671 (Ill. 2004)).

"An 'agreement' is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Zabinsky*, 807 N.E.2d at 671; *see also Schultze v. ABN AMRO, Inc.*, 83 N.E.3d 1053, 1059 (Ill. App. Ct. 2017).

Even so, the statute does not apply to any run-of-the-mill promise made by anyone and everyone at a company. The statute requires "mutual assent." *See Zabinsky*, 807 N.E.2d at 671. And mutual assent requires authority to give that assent. No authority, no assent. And no assent, no IWPCA claim.

The need for a contract or an agreement dooms Norman's claim. Norman contends that 3C agreed to pay her a 0.25% commission on total sales. *See* Cplt., at ¶ 18 (Dckt. No. 1).

That allegation didn't survive the proving grounds of discovery.

The only basis for the claim is the series of texts from Austin in December 2021. Norman admitted that she has no other evidence to support the existence of an agreement. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 52 (Dckt. No. 33). She has no other documents, communications, or conversations to support her claim for 0.25% commissions on total sales (as opposed to internal sales). *Id.*

Austin's texts cannot provide the basis for a claim under the IWPCA unless Austin had the authority to give assent on behalf of the company. The record includes no such evidence. In fact, the record establishes the opposite.

The company presented evidence that Journay (again, the CEO) had "sole authority" to approve any changes to Norman's compensation. *See* Journay Decl., at ¶ 4 (Dckt. No. 30-5). Austin did not have the authority to increase Norman's pay. *Id.* at ¶ 5; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 33).

At most, Austin had the ability to make recommendations to Journay about pay decisions. But at the end of the day, the decision was in Journay's hands. *See* Journay Decl., at ¶ 5 (Dckt. No. 30-5). And Journay never approved giving Norman a commission of 0.25% of total sales. *Id.* at ¶ 7.

Norman argues that Austin did have that authority. And she points to testimony from her own deposition (which is fine).

Norman's testimony doesn't get her very far. At one point, Norman did testify that Austin had the authority to set her pay. She testified:

> Q: When you were working as a national sales manager, were you aware of who had authority to make decisions about commission structures and payments to managers?
>
> A: Yeah, it was Nicole [Austin].

*See* Norman Dep., at 60:18-22 (Dckt. No. 32-10).

But moments later, Norman explained what she meant, and the explanation took it all back. As it turns out, Austin didn't have the power to increase anyone's pay unilaterally after all. Austin had the ability to make recommendations, not decisions.

Austin typically got Journay to go along with her recommendations. But Austin wasn't running the show. Only Journay had the authority to approve pay increases:

> Q: Why do you think – you're saying Nicole had that authority?
>
> A: Yes.

9

> Q: Why do you say that?
>
> A: She told me.
>
> Q: What did she specifically say?
>
> A: She was setting the structure, *she would get it approved*. I think *maybe from Justin* [Journay]. But that she would set things in place and *Justin would approve it*.

*Id.* at 60:23 – 61:7 (emphasis added).

The next few answers reinforced the point. Norman admitted that any pay increase required Journay's approval:

> Q: You were just describing Nicole had shared with you what she was planning to do, right? Is that yes?
>
> A: Yes. That was part of it, that was part of it. She would also verbally communicate that – she basically said, would say that *Justin would agree to just about anything that she wanted to do*. She was letting him or he would let her run the company. Not run the company, but run the sales team.
>
> Q: You said she would I think *get it approved* by Justin, is that what you said?
>
> A: Yeah.
>
> Q: Meaning *Justin's approval was needed*?
>
> A: I think so.

*Id.* at 61:12-24 (emphasis added); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 33).[1]

---

[1] In response to 3C's statement of facts, Norman points to testimony from Brittany Winter (a contractor with the company) to support the notion that Austin and Human Resources had the authority to set Norman's compensation. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 9, 52 (Dckt. No. 33). But that's not what Winter said at all. Winter simply testified that Norman's compensation "would be discussed with her supervisor and human resources." *See* Winter Dep., at 17:3-4 (Dckt. No. 32-5).

Putting it all together, any pay increase for Norman needed the approval of the CEO, Justin Journay. Journay didn't approve giving Norman a commission based on total sales. So Norman and the company didn't reach a deal.

Norman has no claim under the IWPCA. The IWPCA enforces agreements. But 3C didn't agree to pay Norman commissions based on 0.25% of total sales. So there is nothing for the IWPCA to enforce, which means that there is no IWPCA claim.

## Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment.

Date: July 7, 2025

Steven C. Seeger
United States District Judge